Filed 11/24/14  P. v. Del Toro CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B238494 |
| Plaintiff and Respondent, | |
| v. | (Los Angeles County Super. Ct. No. BA320299) |
| DAVID DEL TORO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lance A. Ito, Judge.  Affirmed.

James H. Barnes for Defendant and Appellant.

Kamala D. Harris, State Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, James William Bilderback II and Marc A. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

_____

David Del Toro (appellant) was convicted by a jury of second degree murder (Pen. Code, § 187, subd. (a)). He was sentenced to 15 years to life in state prison. He appealed, contending the trial court erred in admitting evidence of domestic violence and evidence of his attendance of prior domestic violence and alcohol abuse classes, in addressing juror misconduct and in denying his motion to suppress. We affirm.

*FACTUAL & PROCEDURAL BACKGROUND*

In the early morning hours of August 16, 2006, a motorist saw the body of Jennifer Flores lying on Loleta Avenue in Eagle Rock, dressed only in a torn shirt and bra. After the motorist called 9-1-1, police and paramedics arrived and tried to revive Flores without success. There were cuts on her head and marks on her legs and buttocks and tire tracks near her head. There was a white rope lying next to her and dirt in her hair. The officers followed the tire marks to Vincent Street, less than one mile away. The tracks ended immediately in front of 5124 and 5127 Vincent, which were across the street from each other. A Toyota truck was parked in one of the driveways to 5127. Using a flashlight, the officers saw a red stain in the driveway. There was blood in the truck bed and wheel well. There was hair on the tires and the undercarriage of the truck. There were rope fibers on the bottom of the truck. Inside the truck, there was blood on the car mat and there were blood-stained shoes in a plastic bag. There was a rope in the driveway matching the rope found by Flores's body. The area in front of the house and the bottom of the truck appeared to have been recently hosed down and a hose in the driveway was dripping. There was blood on a pillar at the front of the house. Flores's car was parked in front of the home.

At approximately 6:30 a.m., officers knocked on and kicked the front door. Appellant opened the door, wearing only his underwear. He had no blood on his body but there were small cuts on his hands. There was blood on the carpet inside the front door and blood stains on the coffee table. A fan was pointed at the stain on the carpet. Next to the coffee table, there was a plastic bag containing blood-stained clothing and a towel. Next to a blood-stained sink there was a rope and a pair of gloves. There was a

2

rope-tying manual in the living room.  Other than the blood, there were no signs of a struggle.  The officers handcuffed appellant and took him into custody.

Appellant was interviewed by police that day.  He was a captain in the Los Angeles Fire Department and lived by himself at 5127 Vincent.  He had known Flores for six or seven years, but had not seen her recently until about three or four weeks before the murder.  At that time, she came over to wash her clothes, and "got naked" in front of him.

On August 15, 2006, Flores came over to spend the night at appellant's house because she was living in her car.  At approximately 7:45 p.m. a man arrived at the house.  Flores spoke to the man and he left.  Appellant thought Flores said his name was Rick or Nick.

Appellant told the officers he and Flores partied and drank tequila together.  They then argued about whether Flores could stay.  Appellant got angry at her, and admitted grabbing her, but said he did not hit her.  Appellant repeatedly said he did not have sex with Flores although she offered.  Appellant said "I did touch her, but it was a sexual way, it wasn't . . . .  [¶]  When she was sitting on the couch kind of like, putting her feet up by me, and rubbing her legs and all that kind of stuff."  He admitted he was very drunk but she went to bed in the guest room or the living room.  Some time during the night he heard yelling.  Appellant  was concerned the man had returned, and got up to check to see if the money he had left on a dresser was still there.  Then he locked his bedroom door went back to sleep and was awakened by the police.  He denied killing Flores.

*Motion to suppress*

On August 24, 2007, prior to trial, appellant moved to suppress all statements he made to the police when they arrived at his home and during his detention and interrogation at the station.  The motion was based on the grounds that the statements were the product of an unlawful detention and arrest in violation of the Fourth Amendment and made without proper warnings pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 in violation of the Fifth Amendment.

3

On August 28, 2007, appellant moved to suppress all evidence obtained by the police during the search of his home on the grounds that the warrantless search and seizure violated his Fourth and Fourteenth Amendment rights. He also moved to quash and or traverse the search warrant

The motions were heard on several days commencing on September 7, 2007 and denied on January 8, 2008.

*The Trial*

Opening statements began on February 2, 2011.

A witness who lived across the street from appellant, testified that at around 12:30 a.m. on August 16, 2006, she heard a man and woman arguing and then tires screeching from her bedroom window.

Doctors and forensic experts testified Flores had suffered a broken nose, a broken jaw, and two broken ribs. Her body had cuts and dragging marks. The deputy medical examiner from the coroner's office said the cause of death was strangulation with blunt force trauma to the head. There was no evidence of a sexual assault. Flores's blood alcohol level was between .30 and .40. An expert testified this would be consistent with having had 15 to 20 alcoholic drinks. Appellant had a .12 blood alcohol level. The expert testified at that level he would be impaired or unconscious. The blood stains were tested and all were determined to come from Flores. A glove found in the truck was tested and Flores's DNA was found on it. Flores's DNA was found in the tire tracks and on the pillar. Gloves found in appellant's kitchen sink had appellant's DNA on the inside and Flores's DNA on the outside.

The tape of appellant's police interview was played for the jury.

William Vicary, a psychiatrist, testified he had treated Flores for depression from July 1999 until 2003.

Flores's brother testified she had been transient during the last year of her life.

Monica Gibo was called as a witness by the prosecution. She testified that in 2001 she and appellant were in a romantic relationship. In September 2001, she got into an argument with appellant at his house. He was drunk and he struck her with a coat hanger.

4

When they went to bed, he put his hands around her neck saying it would be easy to snap her neck. In December 2001, he grabbed her by the collar and threw her against the doorway. He then grabbed her by the leg and dragged her down the hall. Ralph Aragon, who was appellant's roommate, was there. She had bruises on her leg and back. When she went to work, her co-worker Kennae Jeffries saw the bruises. In another incident that month, she and appellant got into an argument while in the car. He slapped her in the arm and when she tried to get out, he grabbed her again. When she got out, he yelled obscenities at her and threw the car keys at her. In February 2002, they got into another argument when he was drunk. He kicked her in the back and she called the police. Each of the four incidents occurred when he was drinking.

On cross-examination, Gibo said that on the day following the incident with the hanger, appellant said he did not remember what happened. She admitted that in December 2001, she saw appellant in his car with another woman and Gibo chased them in her car.

On re-cross examination, she admitted she had accused Aragon of exposing himself.

Kennae Jeffries testified that he worked with Gibo and in December 2001 he noticed a huge bruise on her back. She told him that appellant was intoxicated and dragged her down the hall. She told Jeffries, "during those times when he gets intoxicated is when he kind of takes out his anger on her."

Regina Vargas testified she had a romantic relationship with appellant between 1998 and July 2006. On one occasion, she was in a car with appellant when they realized Gibo was chasing them in her car. When they pulled over, Gibo yelled at them using foul language. Appellant and Vargas drove off. Vargas acknowledged that appellant occasionally passed out from drinking.

Michael McOsker, appellant's firefighter union representative, testified that in 2002, he represented appellant in a disciplinary proceeding and as a condition of continued employment, appellant was evaluated for problems with alcohol abuse, and completed an anger management and domestic violence class.

5

Andres Carranza testified that he had known Flores since April 2006. She had stayed at his house for a few weeks and he had given her money and tried to help her find a job. Flores was emotionally unstable and had no permanent home. She was constantly intoxicated. Carranza testified that once a man named Nick called Flores on his home phone. She then left his house with the man in his truck, while arguing with him. On cross-examination, he said he never mentioned the man's name until a defense investigator asked if the friend's name may have been Nick.

Appellant called an automotive expert who said that the tires from appellant's truck did not cause the tire tracks in police photographs.

A defense expert testified Flores died from severe head injuries, blunt injury to the neck and a high blood alcohol level, but strangulation was not the sole cause of death.

Appellant testified on his own behalf. He denied having a sexual or romantic relationship with Flores. Flores came over often to his house. He admitted the truck parked in the driveway was his. On August 13, 2006, she left a note on his truck asking him to call her. August 14th was his last shift with the Fire Department before he retired. Flores came over on August 15th. Earlier that day, appellant had used a rope to tie his water heater down. He had "a bad shift" and thought he had made a blunder, so he started drinking from approximately 11:00 a.m. to 9:00 p.m. Flores returned to his house that evening. Later than evening, a man named Nick came over to see Flores. After he left, Flores and appellant argued because he did not let her use his truck. He denied ever hitting her or striking her. They drank together, he went to bed and Flores watched television on his couch. He remembered getting up later that night and "making a mess" and trying to clean it up with a bucket of water. Appellant denied striking or threatening to kill Gibo.

Two Fire Department co-workers of appellant described an emergency call they made on August 14 where a woman and a boy had been stabbed to death. During the call, appellant had sustained a cut to his hands.

Other witnesses testified that appellant was an accomplished firefighter and that his job duties included rope skills and knot-tying.

6

Karen Torres, a former girlfriend of appellant's, testified that they had plans to see each other on August 16, 2006. She spoke to him on the phone at 4:30 p.m. on August 15, 2006.

Theresa Stankman, who was in a romantic relationship with appellant, spoke to him on the phone at 6:50 p.m. on the night of the murder. Appellant seemed "exhausted, drained" but "coherent." He mentioned the emergency call and the two stabbing victims. She had previously seen firefighting manuals on his coffee table.

Dora Palacio, who had previously dated appellant, said she called him on August 15 at approximately 6:45 p.m. and his speech was slurred and he sounded distraught.

Appellant's sister, Emma Mallory, testified that she spoke to appellant on August 15th and he sounded tired and anxious, mentioning the emergency call.

Enith Pack, who lived a few doors down the street from appellant in August 2006, identified a picture of the Toyota truck as appellant's. She testified that she drove by his house around 9:00 p.m. on August 15th and noticed his truck was parked in a different position than usual.

*CONTENTIONS ON APPEAL*

Appellant contends the trial court erred in denying his motion to suppress. He argues the officers trespassed on his property when they made observations which they used to justify entering his home and to support the application for the warrant. He also contends the search of his home and the seizure of documents exceeded the scope of the warrant. Next, he contends the court erred in admitting evidence of prior acts of violence against his former girlfriend, Monica Gibo, and evidence of his attendance at domestic violence and alcohol abuse classes. He also contends the prosecutor used evidence about the alcohol abuse classes in his argument to proffer an erroneous legal theory about implied malice. Finally, he contends the court did not respond properly to the juror misconduct which occurred. He argues the court should have conducted a more thorough hearing, dismissed one more juror, and allowed defense counsel to have access to juror contact information, so it could conduct a more detailed investigation into the misconduct.

7

*DISCUSSION*

*1. Search & Seizure Motion*

The hearing on the motions to suppress and motions to quash and/or traverse commenced on September 7, 2007, and concluded on January 8, 2008. Several witnesses testified.

Los Angeles Police Officer Ivan McMillian testified that when they found Flores, it looked like she had been run over and an apparent tire track led away from her body. At approximately 3:00 a.m., he went to the location where the tracks ended on Vincent Street and stood guard there.

Los Angeles Police Detective Harold Di Croce described the tire tracks as "very obvious" and at approximately 4:40 a.m. followed them to 5127 Vincent. From the street, using a flashlight, he saw what appeared to be a bloodstain at the base of the driveway. It was faded, and looked as if there had been an attempt to wash it away. A pickup truck was parked in the driveway. Detective Di Croce then walked up the ungated driveway, saw rope on the driveway and looked in the bed of the pickup truck, where he observed what appeared to be a pool of blood and water. There was no sign in the driveway, and a visitor would have to pass the truck to get to the front door.

Los Angeles Police Detective Wallace Tennelle arrived at the location where the body was found at approximately 5:25 a.m. He observed the tire tracks leading to 5127 Vincent, walked onto the driveway and observed the blood in the truckbed. He walked up the driveway to the front porch and noticed an apparent bloodstain on a pillar on the front porch. He left at approximately 6:15 a.m. to go to the police station to draft a search warrant.

Los Angeles Police Detective Ismael Aldaz arrived at the house around 6:00 a.m. Based on the death, the blood and other evidence outside the home, and the apparent attempt to wash the blood off the car, Detective Aldaz decided to conduct an exigency sweep of the home to look for additional victims and to prevent any further destruction of evidence. The blood on the pillar was not visible from the sidewalk. At approximately 7:00 a.m. the officers knocked on appellant's door and just before they started to force

8

the door open, appellant answered.  A large bloodstain was visible just inside the door.  The officers handcuffed appellant and transported him to the station.  They interviewed him around 8:30 a.m.

The search warrant was issued at 10:10 a.m.  It authorized the officers to search for white fabric, any type of rope or cord, evidence of blood, hair or sand, vehicle tires and photographs of the decedent or "any other item of evidence that may identify the decedent."

In addition to the rope, glove, blood-stained clothing and the rope-tying manual, police seized envelopes and papers in a dresser drawer.  The papers were records of appellant's attendance at domestic violence classes.

The court denied the motion to suppress.  It found, inter alia, that the officers' observations made from a public street onto appellant's driveway were in plain view and appellant could have no expectation of privacy as to the presence of the tire tracks leading up to the truck in the driveway and the blood stain in the driveway.  The court noted the driveway was not fenced off or protected from the street in any way, and there was no effort to create a zone of privacy around the driveway.  It noted that although there was a carport or a garage, appellant did not attempt to park the truck there, but left it in the driveway in plain view.  The court concluded that once the officers observed the tire tracks and the bloodstain, they had probable cause to walk up the driveway.  Again, it found no effort to obscure the driveway or prevent anyone from walking up it, especially since the mailbox was on the porch of the house, and thus the front door was readily accessible to any visitor on the street.  The officers' subsequent observations of what appeared to be the pool of blood and of the headband with hair in the truck bed, as well as the blood on the post on the front porch, were sufficient to justify their concern that there might be additional victims within the residence.  When appellant opened the door, the blood smears on the carpet immediately inside the doorway justified their sweep of the residence for additional suspects or victims.  The court concluded the officers had sufficient probable cause to arrest the defendant.

9

Appellant's counsel then argued that the police exceeded the parameters of the search warrant by seizing documents relating to classes taken by appellant. The court denied that motion without comment.

*a. Review of denial of motion to suppress*

To prevail on a motion to suppress challenging the constitutionality of a search or seizure, a defendant must show a legitimate expectation of privacy in the place searched. (*People v. Chavez* (2008) 161 Cal.App.4th 1493, 1499.)

When the prosecution relies on evidence obtained by law enforcement officers without a warrant, it bears the burden of establishing that the search was justified by some exception to the warrant requirement such as "exigent circumstances." (*People v. Chavez, supra*, 161 Cal.App.4th at p. 1499, quoting *People v. Camacho* (2000) 23 Cal.4th 824, 830.)

We defer to the trial court's express and implied factual findings which are supported by substantial evidence. In determining whether the search and seizure under those facts was reasonable under the Fourth Amendment, we exercise our independent judgment. (*People v. Tully* (2012) 54 Cal.4th 952, 979; *People v. Redd* (2010) 48 Cal.4th 691, 719.)

Appellant argues that police trespassed onto his property to make observations and they entered his house without a warrant, rendering inadmissible the evidence seized, his post-arrest statements, and voiding the warrant based on the officers' observations.

*b. Observations made on the driveway*

We first discuss the actions of the officers prior to entering appellant's home.

"The Fourth Amendment expressly recognizes that individuals have a legitimate expectation of privacy in their own homes. (U.S. Const., 4th Amend.; [citation].)" (*People v. Lieng* (2010) 190 Cal.App.4th 1213, 1222.) The zone of protection afforded to a person's home does not necessarily extend to the property line, only to the curtilage, "the land immediately surrounding and associated with the home." (*Oliver v. United States* (1984) 466 U.S. 170, 180.)

"The curtilage concept originated at common law to extend to the area immediately surrounding a dwelling house the same protection under the law of burglary as was afforded the house itself." (*United States v. Dunn* (1987) 480 U.S. 294, 300.) In *Oliver*, *supra,* 466 U.S. at page 180, the Supreme Court recognized that the Fourth Amendment protects the curtilage of a house and the extent of the curtilage is determined by whether an individual may reasonably expect that the area in question should be treated as the home itself. In *Dunn*, the court held curtilage questions should be resolved with particular reference to four factors: the proximity of the area to the home, whether the area is included within an enclosure surrounding the home, the nature of usage of the area, and the steps taken by the resident to protect the area from observation by passersby. (*Dunn, supra*, 480 U.S. at p. 301.) "We do not suggest that combining these factors produces a finely tuned formula that, when mechanically applied, yields a 'correct' answer to all extent-of-curtilage questions. Rather, these factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." (*Ibid*.)

Appellant contends the officers trespassed on the curtilage of his home by entering the driveway and walking around his truck, and then again by walking up on his porch to his front door.

"An officer's observation with the naked eye from a vantage point open to the public is ordinarily not regarded as a search within the meaning of the constitutional proscription against warrantless searches. [Citation.]" (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1015.)

The officers observed tire tracks from the body on a public street, and they followed them to the front of appellant's home. From the street, the officers saw appellant's truck and a blood stain in the driveway. These observations were made in plain view and thus a warrant was not necessary. (*People v. Chavez, supra*, 161 Cal.App.4th at pp. 1500-1501.)

11

These observations were enough to justify the actions of the officers in walking up the driveway, where they observed a rope, and a hairband and blood in the bed of the truck. The driveway was directly visible and accessible from a public street. The driveway was not obscured or gated, there was no sign, and the officers could see the residence from the driveway. There were no steps taken by appellant to hide the truck or its contents, and in fact, appellant had left it in the driveway and not in a carport or garage.

The bed of the truck was also left open and not covered, so officers could easily see what appeared to be blood. They could see the undercarriage of the truck had been washed and that there was hair and blood on the truck's tires and in the wheel well. Appellant could have had no reasonable expectation of privacy in the state of his truck's exterior which was parked in the driveway, not in his carport or his garage. A trail of blood led from the truck to the front door. In fact, the mailbox to the house was on the front porch, so that regular access to the front door could have been expected by appellant. (*People v. Edelbacher, supra*, 47 Cal. 3d at p. 1015; *People v. Lieng, supra,* 190 Cal.App.4th at pp. 1224-1225.) Therefore, the entry onto his driveway did not require a warrant and the observations of the dripping hose, and the blood on the pillar should not have been suppressed.

In addition, the fact that the discovery occurred in the early morning hours and the officers made the observations by flashlight does not prevent application of the plain view doctrine. (*People v. Lieng, supra*, 190 Cal.App.4th at p. 1228 [night vision goggles used]; *People v. Chavez, supra,* 161 Cal.App.4th at p. 1501.) In any event, the state of the driveway would have inevitably been discovered in a matter of hours. (*People v. Redd*, *supra*, 48 Cal.4th at p. 721.)

Based upon the tire tracks and the bloodstain in the driveway, the officers were justified in walking up the driveway to the front porch and door which were adjacent to the driveway. Their subsequent observations of blood on the pillar and the blood and hair in the truck bed and in the wheel well, and the trail of blood to the front door did not violate appellant's Fourth Amendment rights.

*c. Entry into the house*

We next turn to the actions of the officers as they entered appellant's home, spoke to him and made observations of the home.

Appellant contends he opened the door only because officers were about to break it down and not because he consented to the entry. He argues they had drawn their guns and attempted to kick down the front door so that their entry was unlawful.

Detective Aldaz testified that he felt there were exigent circumstances justifying their entry into appellant's home, whether or not he consented to the entry.

"'[E]xigent circumstances' means an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence. There is no ready litmus test for determining whether such circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers." (*People v. Ramey* (1976) 16 Cal.3d 263, 276.)

In determining whether there are exigent circumstances, we review the facts to see (1) if a grave offense is involved, particularly if it is one of violence; (2) whether the suspect is reasonably believed to be armed; (3) if there is a clear showing of probable cause; (4) if there is strong evidence that the suspect is within the premises; (5) there is a likelihood the suspect will escape if not swiftly apprehended, (6) the entry can be made peaceably; and (7) whether there is a threat that delay would result in the destruction of evidence. (*People v. Williams* (1989) 48 Cal.3d 1112, 1138-1139.) We also look to see if there is a risk of violence. (*People v. Chavez, supra,* 161 Cal.App.4th at p. 1503.)

Appellant contends there were no exigent circumstances because the search took place five to six hours after the discovery of the body. But the exigency became apparent only once the location was secured. The sun had risen and the officers observed the bloodstains on his driveway, and the trail of blood from the truck to the front door. (*People v. Williams, supra,* 48 Cal.3d at pp. 1138-1139.) In this instance, there was evidence of extreme violence and the death of a young woman, a body left abandoned in the street with no attempt to hide it, tire tracks showing an attempt to escape. Thus, there

was a grave, violent offense involved and there was probable cause to believe appellant was the perpetrator of the crime because of the blood trail and was possibly armed with the murder weapon. It was reasonable for the officers to conclude that appellant was at home since his truck was there, and it was reasonable for the officers to conclude that evidence would be destroyed because of the recently-washed truck and that appellant might escape if not swiftly apprehended. We conclude the officers were justified in knocking on the door and then entering the home once appellant opened the door. Since there was a bloodstain visible near the front door, the officer were then justified in entering appellant's home.

### d. Class enrollment documentation

Appellant contends the search warrant was the product of an unjustified warrantless entry and the items seized in his house, in particular the documents showing his participation in alcohol abuse and anger management classes, should have been suppressed.

Because we have outlined why we think the observations made up until the point of entry were justified, we do not find that the search warrant should be invalidated because it was based on those observations. We now turn to the scope of the warrant and whether the class enrollment documents should have been seized.

The District Attorney had originally subpoenaed the documents from the Employees' Assistance Program of the Fire Department which described appellant's involvement in a diversion program run by the firefighters' union. The custodian of records appeared in response to the subpoena and objected to their disclosure. The program representative inadvertently sent the records directly to the prosecutor. Defense counsel then objected and the court directed the prosecutor to turn the records over to the court. The trial court issued a written order allowing the prosecution to introduce testimony from a "qualified representative" as to the nature of the counseling program and its curricula for alcohol abuse and anger management, the record about appellant's attendance in the program, and testimony from a counselor who had dealt with appellant about discussions she had with appellant on those topics. Appellant then challenged the

14

ruling with a motion to quash the subpoena. In a hearing on that motion, the court found appellant had signed a waiver form prior to his attendance at the program authorizing disclosure of his records of attendance. It held the waiver form thus allowed the prosecution to subpoena those records and use them at trial.

Appellant contends on appeal that the officers searched for and seized items beyond the scope of the warrant, in particular, he objects to the seizure of documents found in a dresser drawer which referred to his attendance at the alcohol abuse and anger management programs. Appellant did not specifically address these items at the suppression motion, and thus it could be argued that he forfeited this objection. (*People v. Tully, supra,* 54 Cal.4th at pp. 979-980.) However, because he raised the scope of the search in general, we will address his contention about these particular items.[1]

"Whether a warrant's description of property to be seized is sufficiently particular is a question of law subject to independent review by an appellate court. [Citation.] In considering whether a warrant is sufficiently particular, courts consider the purpose of the warrant, the nature of the items sought, and 'the total circumstances surrounding the case.' [Citation.] A warrant that permits a search broad in scope may be appropriate under some circumstances, and the warrant's language must be read in context and with common sense. [Citation.]" (*People v. Eubanks* (2011) 53 Cal.4th 110, 133-134.)

Because the papers showing appellant's attendance at anger management class were seized during the execution of a search warrant, appellant had the burden of proving the search was beyond the warrant's scope. (*People v. Reyes* (1990) 223 Cal.App.3d 1218, 1224.)

In *Eubanks, supra,* 53 Cal.4th 110, the officers read and seized letters lying near the defendant's bed when searching the residence for items tending to show her dominion and control over the apartment. The court held the officers were entitled to search

---

[1]     In his opening brief, appellant mentions only the class enrollment documentation, but in his reply brief, he refers to items taken from inside bags, such as the bloody clothing.

15

through trash cans and to look at any papers in the home and they were entitled to seize the letters because they were in plain view and their incriminating character was immediately apparent. (*Id.* at p. 135.)

In *People v. Nicolaus* (1991) 54 Cal.3d 551, police had a warrant to search the defendant's home for letters, papers and bills tending to show who occupied the apartment. They found documents in the defendant's writing which revealed his plans to harm the victim and his motives. The search and seizure were found to be justified. (*Id.* at p. 574.)

Here, the search warrant authorized the detectives to search for "any other item that could identify the decedent."

"When a legitimate search is under way, and when its purpose and its limits have been precisely defined, nice distinctions between closets, drawers, and containers, in the case of a home, or between glove compartments, upholstered seats, trunks, and wrapped packages, in the case of a vehicle, must give way to the interest in the prompt and efficient completion of the task at hand." (*United States v. Ross* (1982) 456 U.S. 798, 820-821.)

At the time, the officers had no way of knowing who Flores was and whether she lived at the house or was related to appellant. Given the scope of the warrant, the officers could legitimately seize papers in the house to see if they identified Flores since the tire tracks led directly to the home. Appellant did not show that the officers were unjustified in taking the papers from the dresser drawer. Because the warrant also authorized a search for items which contained blood, hair or sand, and the officers had discovered bloody shoes in the truck, the officers were justified in looking inside bags found in the house. The trial court did not err in denying the motion to suppress.

2. *Prior Domestic Violence*

a. *Admissibility of Gibo's testimony*

Appellant contends the trial court should not have admitted evidence of prior domestic violence.

16

The admission of other crimes evidence is governed by Evidence Code section 1101.[2] Section 1101, subdivision (a) prohibits the admission of evidence of a person's character, including evidence of uncharged misconduct to prove the conduct of the person on a specified occasion, unless, the evidence is relevant to establish some fact other than the person's character or disposition. (§ 1101; *People v. Ewoldt* (1994) 7 Cal.4th 380, 393.) The evidence of the other crimes may be admitted if "it tend[s], logically, naturally, and by reasonable inference, to establish any fact material for the people, or to overcome any material matter sought to be proved by the defense[.] [Citations.]" (*People v. Peete* (1946) 28 Cal.2d 306, 314-315.) The evidence of a similar crime may be admitted to prove identity, intent or motive. (§ 1101, subd. (b).) But the charged and uncharged crimes must be sufficiently similar to support a rational inference of identity, common design or plan, or intent. (*People v. Kipp* (1998) 18 Cal.4th 349, 369.)

The trial court has discretion to admit evidence of other crimes committed by a defendant. (*People v. Roldan* (2005) 35 Cal.4th 646, 705.) In addition to considering whether the evidence is relevant, the court must consider: (1) the materiality of the fact to be proved or disproved, (2) the probative value of the evidence, and (3) the existence of a rule or policy requiring exclusion even if the evidence is relevant. (*Id*. at pp. 705-706; *People v. Hawkins* (1995) 10 Cal.4th 920, 951, disapproved on another point in *People v. Lasko* (2000) 23 Cal.4th 101, 110.) In addition, the probative value of the evidence must be substantial and not be outweighed by the probability that its admission would create a serious danger of undue prejudice, or confusing the issues, or of misleading the jury. (*People v. Kipp*, *supra*, 18 Cal.4th at p. 371.)

*(1) Section 1109*

Section 1101 provides that: "(a) Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of

_____

[2] Statutory references are to the Evidence Code unless otherwise specified.

17

specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion. [¶] (b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, . . . .) other than his or her disposition to commit such an act. . . . ."

Section 1109, subdivision (a)(1) provides in pertinent part that: "[I]n a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352."

Appellant contends that Gibo's testimony about prior domestic abuse should not have been admitted pursuant to section 1109 because he was not "accused of an offense involving domestic violence." Appellant argues that because he did not have a dating relationship with Flores, the crime did not involve domestic abuse.

Subdivision (d)(3) of section 1109 refers to Penal Code section 13700 for the definition of "domestic violence." Section 13700 (which addresses arrest policies and procedures) defines the term as "abuse committed against . . . a spouse, cohabitant, former cohabitant or person with whom the suspect . . . is having or has had a dating or engagement relationship." Domestic violence is also defined in the Family Code with the same references to the relationship the abuser has with the victim, and defines the term "dating relationship" as "frequent, intimate associations primarily characterized by the expectation of affection or sexual involvement independent of financial considerations." (Fam. Code, § 6210.)

In the indictment, appellant was accused of one count of murder (Pen. Code, § 187, subd. (a)), one count of torture (Pen. Code, § 206) and a special circumstance murder allegation based on torture. It did not make any reference to domestic violence, but it should be noted that there is no special category of murder or torture with respect to domestic violence (e.g. Pen. Code, § 243, subd. (e)(1), battery). Therefore, the question

18

of whether appellant was "accused of an offense involving domestic violence" is not dispositive.

The prosecution called Gibo as a witness pursuant to section 1109. In a motion in limine held out of the presence of the jury, defense counsel argued that since the People conceded there was no "business or romantic relationship between appellant and Flores, the relevant statutory authority was section 1101."

Ralph Aragon testified during a motion in limine he assumed appellant and Flores had a sexual relationship based upon what Flores and appellant had said to him. Appellant had asked Aragon if he could "see" Flores, which Aragon took to mean that appellant wanted to have a sexual relationship with her. Aragon heard a recorded message from appellant to Flores which made him think the relationship was sexual, although he said it was an "educated guess." But Aragon did not testify at trial.

The trial court concluded that there was evidence of a "domestic relationship" between Gibo and appellant.[3]

In determining whether there was a "dating relationship," it is undisputed that appellant and Flores were not strangers; they had known each other for years and he testified he had allowed her to stay at his home on more than one occasion. But there was no evidence that appellant and Flores had a sexual relationship. In his recorded interview with police, appellant repeatedly denied having sex with Flores or that he had

---

[3] The court stated, "I'm analyzing this issue under both 1109 analysis and 352. And under the 1109 analysis, I agree that there is sufficient evidence in the record to establish a domestic relationship between the two people involved here. [¶] Specifically, as pointed out by the People, the victim is found essentially nude, clothed only with a t-shirt that's pulled up over her head. Also, the fact of her bra is ripped in the front, is not unclasped, but actually ripped open in the front. [¶] That is more than sufficient evidence to establish a prima facie case for some type of sexual assault. So it does qualify under 1109. [¶] The next question is whether or not, despite the fact that it qualifies under 1109, whether the court would exercise its discretion under 352, as I'm required to analyze under subsection (a)(3). [¶] And given the nature of the defense, both some other person did it, plus the argument that alcohol intoxication led to a lack of requisite mental state, it does have substantial probative value."

been in a sexual relationship.[4]  He did assert that Flores referred to having oral sex that evening but there was no evidence that they actually engaged in oral sex.[5]  Appellant said she had "got naked with him" in the past, but it was because she was washing her clothes.

We conclude the trial court erred in finding a dating relationship between appellant and Flores based only upon the condition of her clothing, the notes Flores left on the truck and Aragon's speculation.  Thus, the evidence should not have been admitted pursuant to section 1109.

### (2) Section 1101

Even though it was error to conclude that this case involved domestic violence as defined by section 1109, Gibo's testimony could have been admitted pursuant to section 1101, subdivision (b).  If a judgment rests on admissible evidence, it will not be reversed simply because the trial court admitted the evidence under a different theory.  (*People v. Brown* (2004) 33 Cal.4th 892, 901.)[6]

"Although evidence of prior offenses may not be introduced solely to prove criminal disposition or propensity such evidence may properly be admitted whenever it tends logically, naturally, and by reasonable inference to establish any fact material for the People or to overcome any material matter sought to proved by the defense."  (*People v. Montalvo* (1971) 4 Cal.3d 328, 331-332.)

---

[4]     Aragon did not testify at trial.

[5]     The People cite a passage from the interview in which appellant said on the night of the murder, he touched her "in a sexual way," but read in context, it appears that appellant meant to say that he grabbed her to tell her he was trying to help her but did not touch her in a sexual way.

[6]     This principle does not apply when (1) the new theory is not supported by the trial court record and would have required additional evidence to support it or (2) the defendant did not have notice of this new theory and thus did not have the opportunity to present evidence in opposition.  (*People v. Brown, supra,* 33 Cal.4th at p. 901.) However, these exceptions do not apply here because defense counsel argued that section 1101 was the applicable standard.

The evidence presented by the prosecution was that appellant was alone with Flores, was intoxicated, argued with her and she was killed that night and her blood was in appellant's house. This crime bears many similarities with the attacks on Gibo: (1) appellant was alone with a woman in his house, (2) appellant had a familiar, longstanding relationship with the woman, (3) appellant was drinking, (4) appellant argued with the woman, and (5) the woman was violently injured.

Thus the evidence tended to show a common design or plan. It also tended to show identity, that it was less likely that a third party had come to appellant's house and killed Flores and more likely that it was appellant.

"Evidence of uncharged crimes is admissible to prove identity, common design or plan, or intent only if the charged and uncharged crimes are sufficiently similar to support a rational inference of identity, common design or plan, or intent." (*People v. Kipp* (1998) 18 Cal.4th 349, 369.) "The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402.) "A greater degree of similarity is required in order to prove the existence of a common design or plan." (*Ibid.*)

If evidence of an uncharged crime is used to establish the identity of the perpetrator, there must be common features shared between the charged offense and the uncharged misconduct which are sufficiently distinctive that they support the inference the same person committed both acts. "'The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature.' [Citation.]" (*People v. Ewoldt, supra*, 7 Cal.4th at p. 403.)

In order to prove motive there must be a nexus or direct link between the prior crime and the current one, but it is not necessary to show that the crimes were similar. (*People v. Scheer* (1998) 68 Cal.App.4th 1009, 1018.).

In *People v. Spector* (2011) 194 Cal.App.4th 1335, another "high-profile" case, Phillip Spector was convicted of second degree murder of Lana Clarkson. Clarkson was visiting Spector's home when she was killed. Spector came out of the house with a revolver and told his chauffeur he had killed someone. No one else had been in the home

at the time. Because Spector could not be convicted solely on his statement to the chauffeur, the prosecution sought to produce evidence of Spector's history of violence using a weapon against other women in similar situations. (*Id*. at p. 1342.) At trial, the defense sought to prove Spector did not fire the gun and that Clarkson committed suicide. (*Ibid*.)

The other crimes evidence consisted of testimony from five other women who recounted incidents where they had visited Spector at his home or in a hotel and seemingly without provocation he became violent and threatened them with a gun. (*People v. Spector, supra,* 194 Cal.App.4th at pp. 1354, 1355.) Some of these women had sexual relationships with him and some had dating relationships not involving sex.

The court of appeal held the trial court did not err in admitting evidence of the other crimes as evidence to show that Clarkson's death had not been the result of accident, mistake or suicide. (*People v. Spector, supra,* 194 Cal.App.4th at pp. 1372-1373.) The court held the other crimes evidence was relevant to disprove these theories. (*Id*. at p. 1376.)

The *Spector* court also held the other crimes evidence was properly admitted to prove motive under section 1101. The court held there were "defining similarities" between the assault on Clarkson and the other crimes evidence, that is: "'(1) appellant was alone with a woman whom he had invited to his house or hotel, (2) appellant had a romantic or sexual interest in her, (3) appellant drank alcohol, (4) appellant exhibited romantic or sexual behavior with her, (5) she attempted to leave, (6) appellant lost control, (7) appellant threatened her and pointed his accessible gun at her, and (8) appellant blocked or locked the door to force her to stay against her will.' [Fn. omitted]." (*People v. Spector, supra,* 194 Cal.App.4th at p. 1383.) In addition to factors cited by the prosecution, the court noted that appellant became extremely angry or enraged in a significant mood swing. (*Id*. at p. 1384.)

The *Spector* court also concluded the other crimes evidence was not more prejudicial than probative under section 352. "The inculpatory inferences raised here were based on a far more specific foundation than the mere proposition [the defendant]

hates women and tends to assault them with guns. Rather, the evidence showed [the defendant] had a history or committing armed assaults against women in very particular circumstances. The evidence showed that, when fueled by alcohol and faced with a lack or loss of control over a woman who was alone with him and in whom he had a romantic or sexual interest, [defendant] underwent a sharp mood swing, exhibited extreme anger, and threatened the woman with a gun when she refused to do his bidding. This evidence was properly admitted under section 1101, subdivision (b), for the non-propensity purpose of showing (1) [defendant]'s motive for committing an armed assault that might have resulted in an implied malice murder; and (2) absence of accident or suicide on the part of [the victim]. Both theories made it more likely [defendant] had fired the gun, and less likely that [the victim] had used it to kill herself." (*Id*. at p. 1388.)

The court agreed that while there was a possibility the jury could have been motivated to use the other crimes evidence as a reason to punish him since he was not convicted in those crimes, the ruling admitting the evidence was well within the court's discretion. (*People v. Spector, supra,* 194 Cal.App.4th at p. 1390.)

The other crimes evidence in *Spector* was also held admissible for the prosecutor to use to establish a "pattern" of violence and misogyny even though the defense argued it was in essence a showing of propensity or character trait for violence. The court reasoned the testimony was critical to the jury's full understanding of the circumstances of the victim's death, that is how and why she was killed in the defendant's house.

In this case, as in *Spector*, the evidence helped to explain how Flores, a friend of appellant's, came to die such a violent death a short distance away from appellant's home after visiting him while he was intoxicated.

Similarly, in *People v. Kelly* (2007) 42 Cal.4th 763, evidence of the defendant's prior uncharged acts of raping women after he had befriended them under false pretenses and luring them to his home was held to be admissible to prove intent and a common plan. (*Id*. at pp. 785-786.)

Gibo's testimony of four attacks by appellant while he was intoxicated tended to show that it was more likely that appellant killed Flores after an alcohol-fueled

23

disagreement and less likely that an unknown assailant came to the door and killed Flores. As in *Spector*, the Gibo and Flores incidents had the same distinctive pattern and characteristics, so the evidence could have been admitted under section 1101.

### (3) Section 352

Even if evidence of uncharged crimes is relevant under section 1101, a trial court must also weigh the probative value of evidence against its potential for undue prejudice. (*Kipp, supra*, 18 Cal.4th at p. 371; *Ewoldt, supra*, 7 Cal.4th at p. 404.)

Under section 352, a trial court may exclude relevant evidence if its probative value is substantially outweighed by the probability that its admission will necessitate undue consumption of time or create substantial danger of undue prejudice, of confusing the issues or misleading the jury. The prejudice referred to in this section refers to evidence which tends to evoke an emotional bias against an individual but has very little effect on the issues. (*People v. Rucker* (2005) 126 Cal.App.4th 1107, 1119 citing *People v. Bolin* (1998) 18 Cal.4th 297, 320.) Relevant factors in determining prejudice from prior incidents include "whether the prior acts of domestic violence were more inflammatory than the charged conduct, the possibility the jury might confuse the prior acts with the charged acts, how recent were the prior acts, and whether the defendant had already been convicted and punished for the prior offense(s). [Citations.]" (*People v. Rucker, supra,* 126 Cal.App.4th at p. 1119.)

"The principal factor affecting the probative value of the evidence of defendant's uncharged offenses is the tendency of that evidence to demonstrate the existence of a common design or plan." (*People v. Ewoldt, supra*, 7 Cal.4th at p. 404.) Other factors affecting the probative value include the extent to which the source of the evidence is independent of the evidence of the charged offense, the amount of time between the uncharged acts and the charged offense and whether the evidence is "merely cumulative regarding an issue that was not reasonably subject to dispute." (*Id.* at pp. 404-406.) The primary factors affecting the prejudicial effect of uncharged acts are whether the uncharged acts resulted in criminal convictions, thus minimizing the risk the jury would be motivated to punish the defendant for the uncharged offense, and whether the evidence

of the uncharged acts is stronger, or more inflammatory than the evidence of the charged offenses.  (*Id.* at p. 405; *People v. Kelley* (1997) 52 Cal.App.4th 568, 579.)

The probative value of the evidence regarding Gibo was substantial.  Appellant had known Gibo for a long time but when he was alone with her and became intoxicated, he became abusive, and very violent.  Because of the similarities in the two crimes, the evidence was relevant to prove appellant killed someone he knew while under the influence of alcohol.

The time between the two offenses was not unduly long.  Gibo complained of misconduct in 2001 and 2002; Flores was killed four years later.  (*People v. Carter, supra,* 36 Cal.4th at p. 1150; *People v. Kipp, supra,* 18 Cal.4th at p. 372.)

Introduction of the evidence was not unduly prejudicial.  The Gibo incidents were not inflammatory compared to the charged offenses.  They were was not dissimilar to the charged offense because they involved alcohol and appellant's behavior towards a familiar female when he was under the influence.  One of the incidents was verified by Kennae Jeffries's testimony and one of them was verified by the police report Gibo made.  There was no reasonable probability the jury would confuse the Gibo incident with the Flores murder.  The Gibo evidence was relevant because it showed appellant would become violent with females when he was drinking.

Additionally, the potential for prejudice was minimal because the evidence about Gibo was far less inflammatory than the evidence of Flores' brutal beating and murder and was thus unlikely to evoke a prejudicially emotional response from jurors.  (*People v. Carter, supra*, 36 Cal.4th at p. 1150; *People v. Kipp, supra*, 18 Cal.4th at p. 372.)

Appellant's assaults on Gibo shared common features with the murder of Flores.  Both women were well known to appellant.  Appellant beat each woman savagely while at his home and while intoxicated.  The fact that Flores was murdered but Gibo was only bruised does not negate the similarity of the two incidents, since appellant had threatened to snap Gibo's neck.  (*People v. Sully* (1991) 53 Cal.3d 1195, 1224-1225.)  Thus, the evidence of the Gibo testimony could have been properly admitted pursuant to section 352.

*3. Jury Instructions About Gibo's Testimony*

Prior to Gibo taking the stand, the court instructed the jury with a version of CALJIC No. 2.50.02 as follows: "This testimony is going to be offered to you for a limited purpose. . . . Ladies and Gentlemen, evidence will be introduced for the purpose of showing the defendant engaged in an offense involving domestic violence on one or more occasions other than that charged in this case. Domestic violence means abuse against a person with whom the defendant is having or has a dating relationship. Abuse means intentionally or recklessly causing or attempting to cause bodily injury or placing another in reasonable apprehension of imminent bodily injury to himself or another.

"If you find the defendant committed a prior offense involving domestic violence, you may, but are not required to infer that the defendant had a disposition to commit another offense involving domestic violence. If you find that the defendant had this disposition, you may, but are not required to, infer that he was likely to commit and did commit the crime of which he is accused. However, if you find by a preponderance of the evidence that the defendant committed a prior crime or crimes involving domestic violence, this is not sufficient by itself to prove beyond a reasonable doubt that he committed the charged offense. If you determine an inference properly can be drawn from this evidence, this inference is simply an item for you to consider, along with all other evidence, in determining whether the defendant has been proved guilty beyond a reasonable doubt of the crime charged and you must not use this evidence for any other purpose."

At the close of evidence, the jury was again instructed with CALJIC No. 2.09[7] and then was again provided with the definitions of domestic violence and abuse. It was not given the Family Code definition of a dating relationship.

_____

[7]     That instruction provides: "Now, certain evidence was admitted for a limited purpose. [¶] At the time this evidence was admitted you were instructed that it could not be considered by you for any purpose other than the limited purpose for which it was admitted. Now, do not consider this evidence for any purpose except the limited purpose for which it was admitted. [¶¶] Now, evidence has been introduced for the purpose of

26

Because evidence of appellant's uncharged offenses against Gibo would have admissible pursuant to section 1101, we next review whether the jury instructions given pursuant to section 1109 were in error.

The jury should have been instructed with CALJIC No. 2.50, which provides:

"[Evidence has been introduced for the purpose of showing that the defendant committed [a crime] [crimes] other than that for which [he] [she] is on trial. . . . [¶] [Except as you will otherwise be instructed,] [This] [this] evidence, if believed, [may not be considered by you to prove that defendant is a person of bad character or that [he] [she] has a disposition to commit crimes. It] may be considered by you [only] for the limited purpose of determining if it tends to show: [¶] [A characteristic method, plan or scheme in the commission of criminal acts similar to the method, plan or scheme used in the commission of the offense in this case which would further tend to show [the existence of the intent which is a necessary element of the crime charged] [or] [the identity of the person who committed the crime, if any, of which the defendant is accused] [or] [a clear connection between the other offense and the one of which the defendant is accused so that it may be inferred that if defendant committed the other offense[s] defendant also committed the crime[s] charged in this case];]

"[The existence of the intent which is a necessary element of the crime charged;]

"[The identity of the person who committed the crime, if any, of which the defendant is accused;]

"[A motive for the commission of the crime charged;]

". . . .

"[The defendant had knowledge or possessed the means that might have been useful or necessary for the commission of the crime charged; ]

showing that the defendant engaged in an offense involving domestic violence on one or more occasions other than that charged in the case. 'Domestic violence' means abuse committed against a person with whom the defendant is having or has had a dating relationship."

27

"[The defendant did not reasonably and in good faith believe that the person with whom [he] [she] engaged or attempted to engage in a sexual act consented to such conduct;]

"[The crime charged is a part of a larger continuing plan, scheme, or conspiracy;]

". . . .

"For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case.

"[You are not permitted to consider such evidence for any other purpose.]"

CALJIC No. 2.50.02, which was given, allowed the jury to infer that the defendant had a disposition to commit another offense involving domestic violence, or that he was likely to commit and did commit the crime of which he is accused. This was error because domestic violence was not involved.

A trial court's instructional error on propensity evidence is subject to federal harmless error review pursuant to *Chapman v. California* (1967) 386 U.S. 18, 24, that is proof of harmlessness beyond a reasonable doubt. Instructional error under California law is reviewed pursuant to *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Mower* (2007) 28 Cal.4th 457, 484.) Under either standard, the erroneous instruction was harmless.

In determining whether this instructional error was harmless, we must consider the instructions as a whole to determine whether the jury applied the instructions in an unconstitutional manner.

The instructions given told the jury it could infer from appellant's prior domestic violence that he committed the charged crime. But the jury was also told to consider the instructions as a whole and instructed what an inference is. (CALJIC Nos. 1.01, 2.00.) The jury was instructed on reasonable doubt standard of proof as part of CALJIC No. 2.50.02, that is, it had to find beyond a reasonable doubt that appellant committed the murder. It did not say that the inference constituted proof beyond a reasonable doubt. It also explained in detail the reasonable doubt standard and repeated the elements of the

28

crime. The instructions explained the People had the burden of proving defendant guilty beyond a reasonable doubt. (CALJIC Nos. 2.90, 8.59.)

We presume the jury followed the court's instructions. (*People v. Holt* (1997) 15 Cal.4th 619, 662.)

Nothing in the instructions authorized the jury to find that it could find appellant guilty solely based on his propensity to commit crimes of domestic violence. The other evidence against appellant was discussed in detail and was far more extensive than the prior offenses.

No reasonable juror would believe that the requirements of the crime of second degree murder could be satisfied solely by evidence of the uncharged offenses. Direct physical evidence linked appellant to Flores and supported the conclusion that he had killed her. We are persuaded the jury's guilty verdict was surely unattributable to the error. (*People v. Quatermain* (1997) 16 Cal.4th 600, 621.)

Appellant also argues that Gibo's testimony was given added emphasis because no other witness's testimony was preceded by such an instruction. Thus, he argues, the prosecution's burden of proof was lightened. We disagree with this contention. As discussed above, the jury was properly instructed on the elements of the crime and the burden of proof. Instructing the jury prior to Gibo's testimony served to emphasize to the jury that Gibo's testimony was offered only for a limited purpose and was necessary since the trial testimony took place over the course of several weeks.

*4. Evidence of Classes Attended by Appellant*

Appellant attended domestic violence classes from 2003-2004. The classes also included information on alcohol and substance abuse. The counselor, Jamie Harmel-Faber testified at trial that appellant attended a domestic violence battery program she taught in 2003 and 2004. The students were specifically taught that the use of alcohol will often intensify the effects of a domestic violence situation. Appellant took 52 sessions on domestic violence, each lasting two hours, and he took 43 Alcoholics Anonymous (AA) classes.

Before Harmel-Faber testified, the court instructed the jury: "The next witness who is testifying is also going to be offered to you for a limited purpose. That purpose will be the content of an education course presented to the defendant, and its limited purpose is for the information that was given to the defendant at or near the time of the commission of this offense. In other words, what he was aware of at the time of the commission of this offense . . . and for that purpose only."

Appellant contends that the admission of the class attendance testimony was error because it showed that he knew or should have known he had a propensity for violence towards women. He contends it should have been excluded as bad character evidence pursuant to section 1101 and should not have been admitted pursuant to section 1109 because there was no dating relationship with Flores.

As discussed previously with respect to Gibo's testimony, to the extent that there was evidence of a pattern of violent conduct while intoxicated, the evidence of prior domestic violence was admissible pursuant to section 1101. The class evidence was also admissible pursuant to section 1101 because it was relevant to the theory of implied malice. Appellant's knowledge and awareness of his proclivity towards violence when intoxicated was directly established by his attendance at domestic violence and alcohol awareness classes. This was a key element of the implied malice theory. (See section 5, *infra*.) Furthermore, there was no prejudice resulting from the recitation of the curriculum of the classes and the record of appellant's attendance. The evidence was properly admitted. (*People v. Lewis* (2009) 46 Cal.4th 1255, 1286.)

5. *Legal Theories Propounded by The Prosecutor*

In closing, the prosecutor talked about the physical evidence. He then argued: "The People's argument is that the defendant committed first degree murder, and that's because the victim was killed by strangulation, and you have overwhelming evidence to indicate that the defendant was conscious during this entire act." He then referred to appellant's attendance at domestic violence and DUI classes. "The defendant was told that his conduct—and this is only related to this defendant. The defendant was told that his conduct could result in injury or danger to somebody else. Now, how do you know

30

that?  Well, we know that the defendant attacked Monica Gibo in 2001 and 2002, eventually ended up with him being arrested for a specific charge and all those other incidents being related to the police about that."  "[I]n the domestic violence class, he was told directly how violence and women and alcohol related to him.  So it's even better that he took the domestic violence class, because he was told that alcohol and violence and women, as it related to him, was a problem. . . .  He was also told, and he did take the AA classes.  So you have the whole mix here, domestic violence classes, AA classes, and the Department gave him five days off because of his behavior.  [¶]  And it was inevitable that someone was going to get killed because of his conduct, because of his conduct which he never corrected back here in 2001 and 2002, it was inevitable that he was going to end up here, even though he was warned, he took the classes, he took the AA classes. [¶]  That is another theory of second degree murder."

The prosecutor also offered two other theories of second degree murder: express malice based on the severity of the assault and strangulation, or "natural and probable consequences" of the assault.

The jury was instructed on second degree murder with CALJIC No. 8.31 as follows: "Now, murder of the second degree is the unlawful killing of a human being with malice aforethought when the perpetrator intended unlawfully to kill a human being but the evidence is insufficient to prove deliberation and premeditation.  [¶]  Now, murder of the second degree is also the unlawful killing of a human being when:  [¶]  1. The killing resulted from an intentional act.  [¶]  2. The natural consequences of the act are dangerous to human life, and,  [¶]  3.  The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life.  [¶]  Now, when the killing is the direct result of such an intentional act it is not necessary to prove that the defendant intended that the act would result in the death of a human being."

Then it was instructed with CALJIC No. 4.21 as follows: "Now, in the crime of murder which the defendant is accused in count 1 or that of voluntary manslaughter which is a lesser crime thereto, a necessary element is the existence in the mind of the defendant of the specific intent to kill or the mental state of malice aforethought.  [¶]

31

Now, if the evidence shows that the defendant was intoxicated at the time of the alleged crime, you should consider that fact in deciding whether defendant had the required specific intent or mental state. . . [¶] Now, intoxication of a person is voluntary if it results from the willing use of any intoxicating liquor, drug or other substance, knowing that it is capable of an intoxicating effect or when he willingly assumes the risk of that effect."

Appellant argues that the prosecutor misstated the law of implied malice to the jury because his statements did not tell them they had to find an affirmative act which endangered the lives of others. Appellant contends that the prosecutor urged the jury over his counsel's objection to find appellant guilty for allowing a woman to come to his residence after he had been drinking, which is not an act which would result in a high probability of death. Appellant also argues that this incorrect legal theory allowed the jury to find second degree murder without a finding of the required element of malice. He points to the two questions sent by the jury regarding clarification which had to do with malice: the first a request for readback of the testimony of the coroner and the defense pathologist on the issue of strangulation, and the second, a request for clarification as to the definition of malice in CALJIC No. 8.11. Appellant argues these requests indicate the jury was focusing on whether the prosecution had proven implied malice and had rejected express malice as a theory.

Implied malice has two components: (1) the deliberate performance of an act, the natural consequences of which are dangerous to life, and (2) the knowledge that one's conduct endangers the life of an another while performing that act. (*People v. Knoller* (2005) 41 Cal.4th 139, 156; *People v. Taylor* (2004) 32 Cal.4th 863, 868.)

There can be no doubt appellant knew from prior experience that he could become violent while intoxicated. His previous experiences with Gibo leading to a police report and his exposure to mandatory educational programs were factors which the jury could properly consider in finding his awareness of the life-threatening risks of alcohol consumption. The particular circumstances surrounding his discipline for the Gibo incidents made him aware of the actual consequences of his drinking even though he

32

claimed to have no memory of the incidents.  All of these factors supported the jury's conclusion that the subjective standard for implied malice was satisfied.  (See *People v. Olivas* (1985) 172 Cal.App.3d 984, 989.)

We find the prosecutor did not present an erroneous legal theory on implied malice.  While he may have initially referred to appellant being told his conduct could result in "injury and danger to somebody else," the prosecutor expressly stated later, "And it was inevitable that someone was going to get killed because of [appellant's] conduct."  Therefore, the prosecutor did refer to the correct standard of endangering a life.  In any event the jury was properly and specifically instructed on the law of implied malice and the elements of the crime and was told to follow that law and not statements of counsel concerning the law, so any statements made by the prosecutor about the law were utterly harmless.  (*People v. Morales* (2001) 25 Cal.4th 34, 47.)

*6.  Federal Constitutional Error*

Appellant contends the evidence of Gibo's testimony, the prosecutor's argument, and the court's instructions to the jury resulted in a violation of his federal due process rights.  Because we have determined that Gibo's testimony was admissible pursuant to sections 1101 and 352, its admission and the jury instructions were proper under state law, there can be no violation of appellant's due process rights.  (*People v. Foster* (2010) 50 Cal.4th 1301, 1335.)

*7.  Juror Misconduct*

*a.  During Deliberations*

The jury began deliberating on February 28, 2011.  On March 14, 2011, Juror No. 10, the foreperson, sent a note to the judge which read: "Your Honor, during deliberations, a juror made a comment related to time served and possibly penalty for manslaughter.  At this point, we have a juror who states this has been on her mind and cannot fairly deliberate.  Please advise."

Counsel agreed to question the foreperson and the individual jurors about what had transpired.  The foreperson was questioned and indicated that a juror had brought up the issue of the sentence which would be served and another juror (Juror No. 6) felt that

33

because of that comment, she could no longer deliberate fairly. The court sent the foreperson back into the jury room and instructed her not to discuss the matter with the other jurors.[8]

The court then called in Juror No. 6, who reported that another juror, whom she described by seat location and first name, had indicated that appellant would serve only seven years for manslaughter, and with time served, he would only serve two more years. This made Juror No. 6 uncomfortable because the conversation was contrary to the instructions. She told the court the discussion about the penalty or punishment went on for a little more than five minutes. She said more than four people participated in the discussion.

The court sent her back to the jury room and called in Juror No. 2, who was the juror reported to have mentioned the penalty or punishment. Juror No. 2 reported that she[9] was the one who brought up the subject. She stated: "I don't know what the possible penalty is. I just know what I've seen on whatever, news, or in the past, but I don't know for sure, and I said that at the time. And I was using it just as a backup of my feeling. It wasn't any knowledge that I have about a penalty." She explained that the next day, Juror No. 6 brought the subject up and Juror No. 2 apologized and all the jurors then agreed not to discuss the subject. Juror No. 2 said she did not remember if she had mentioned a specific number of years.

The court questioned each of the other jurors individually, who basically described the incident in a similar fashion.

Juror Nos. 3, 4, 7, 9, 12 (in addition to 6) specifically remembered Juror No. 2 stating that defendant would only serve two years more for manslaughter after having already served five years. The remaining jurors said it would not impact their decision.

---

[8]     The foreperson and Juror No. 6 were referred to as females in the reporter's transcript.

[9]     Juror No. 2 was also described in conversation as a female.

Juror No. 1 confirmed that a "short discussion" about penalty or punishment had taken place but that it would not affect her decision in this case. Juror No. 4 said that they discussed it "briefly." Juror No. 7 said it lasted 20 to 25 seconds. Juror No. 8 said it lasted three, four or five minutes. Juror No. 11 said the comments went on for less than five minutes. Juror No. 12 described the conversation as "very short."

After Juror No. 11 described the incident as follows: "I believe someone else said that . . . if we decide on that verdict, that he will only get so many years, and then we stopped talking about it, and that was it." Defense counsel asked the court to inquire which juror said there would be a particular sentence with a particular verdict. Juror No. 11 said, "I believe it was—I think it was 7." She did not mention any other juror by number during her discussion.

The following colloquy occurred when Juror No. 7 was called in: "The Court: It's been reported to me that some time last week, the issue of possible penalty or punishment in this case came up. [¶] Juror Seat No. 7: Right. [¶] The Court: Can you tell me if that happened? [¶] Juror Seat No. 7: No, I don't think so. [¶] The Court: Okay. Has-- [¶] Juror Seat No. 7: It may have come up, but didn't come out— somebody came out with that he had served time already, and manslaughter just being two, three years more, and the girl got all upset. She didn't realize that, but nobody knew for sure. They just brought that up, Sir. That's the only thing. " The court reminded Juror No. 7 about the jury instruction not to consider penalty or punishment, and the juror said he had another comment about why deliberations were taking so long and the court instructed him not to say anything more about it.

The court excused Juror Nos. 6 and 2. It replaced those jurors with alternates. It then instructed the jurors to begin deliberations again and warned them not to discuss or consider any penalty or punishment. The court also gave its phone number to Juror No. 6 and encouraged her to call if there was anything else she felt it should know.

Appellant's motion for a new trial, contended, inter alia, that the juror misconduct was prejudicial. The trial court denied the motion, stating that it did think that misconduct occurred, but that an extensive and thorough inquiry was conducted and the

two jurors were properly removed. It also felt that the remaining jurors assured the court they could set aside that discussion, and further inquiry of the reconstituted jury indicated that no other extraneous information was interjected into the deliberations. It stated that it was a fair trial and the evidence supported the verdict.

Appellant contends the court should have conducted further inquiry regarding Juror No. 7's role in the misconduct, based on Juror No. 7's comments which first denied that the issue of penalty came up and referred to a "they" in his comments about who mentioned the sentence length. Appellant also contends the court should have dismissed Juror No. 7 because Juror No. 11 identified him as the one mentioning the length of sentence. Appellant also contends that the court should have instructed the jurors that Juror No. 2's remarks were factually inaccurate. Finally, appellant contends the court should not have denied his motion for a new trial because of the juror misconduct.

Appellant argues that Juror No. 11 pinpointed Juror No. 7 as the one who mentioned the length of the sentence. He also argues that Juror No. 7 was obviously being untruthful because he first said there was no discussion about punishment, and then only described the incident as lasting 25 seconds when the other jurors said it lasted a few minutes.

"When juror misconduct involves the receipt of information about a party or the case from extraneous sources, the verdict will be set aside only if there appears a substantial likelihood of juror bias. [Citation.] Such bias may appear in either of two ways: (1) if the extraneous material, judged objectively, is so prejudicial in and of itself that it is inherently and substantially likely to have influenced a juror; or (2) even if the information is not 'inherently' prejudicial, if, from the nature of the misconduct and the surrounding circumstances, the court determines that it is substantially likely a juror was 'actually biased' against the defendant. If we find a substantial likelihood that a juror was actually biased, we must set aside the verdict, no matter how convinced we might be that an unbiased jury would have reached the same verdict, because a biased adjudicator is one of the few structural trial defects that compel reversal without the application of a harmless error standard. [Citation.]" (*People v. Nesler* (1997) 16 Cal.4th 561, 578-579.)

36

First, we find the court acted properly by holding a hearing to determine what had transpired in the jury room. (*People v. Nesler, supra,* 16 Cal.4th at pp. 581-582.) It called the jurors in individually to determine what statements were made. Although the statements varied slightly, in the end it was clear that Juror No. 2 had stated something about the sentences for the various crimes (which was incorrect) in relation to the time appellant had served. But with the exception of Juror No. 6, each juror said the discussion was brief and then deliberations resumed without further consideration of her remarks. Juror No. 2 did not hold herself out to be an expert on the subject, nor did anyone ask for verification of her remarks. The jury had been instructed not to consider the sentence and to the extent any of them had forgotten or disregarded the instruction, they were reminded of it when Juror No. 6 expressed her dismay at the information the next day. Juror No. 2 apologized and the jurors agreed not to discuss it further. Juror No. 11 was the only one who mentioned Juror No. 7, and even then, was not sure of the number of the juror who brought up the subject. While most of the jurors said the discussion lasted only a few minutes and Juror No. 7 differed by estimating it at 25 seconds, it is undisputed the discussion was very brief. We find no indication in this record that Juror No. 7 was deliberately telling a falsehood, since it was only a slightly different version of what transpired.

Therefore, in determining whether there was a substantial likelihood Juror No. 2's misconduct caused the other jurors to become biased, we can only look to what the jurors said about their understanding of Juror No. 2's comments. Based upon their comments, we can infer that her statements had no significant impact on the jurors' decisions. (*In re Boyette* (2013) 56 Cal.4th 866, 894.) Thus, the court properly dismissed only Jurors No. 2 and 6.

The trial court did not abuse its discretion in denying the motion for a new trial. It is impossible for every jury to be sterile and free from any external factors. (*People v. Riel* (2000) 22 Cal.4th 1153, 1219.) "Not all comments by all jurors at all times will be logical, or even rational, or, strictly speaking, correct. But comments cannot impeach a unanimous verdict; a jury verdict is not so fragile." (*Ibid*.) No indication exists that the

juror was expressing a legal opinion based upon her unique education or training or that any of the jurors were misled or changed their opinion based upon her representations. (*In re Lucas* (2004) 33 Cal.4th 682, 691.)

### b. *Juror Contact Information*

After the verdict had been read, and after the motion on juror misconduct, appellant's counsel made a request for access to the jurors' contact information in order to conduct an additional investigation about jury misconduct and influence by press coverage. At a lengthy hearing in May 2011, the court and the attorneys discussed the extensive press coverage of the case and attempted to determine where Juror No. 2 had gotten the misinformation about the length of a manslaughter sentence.

The judge noted that he was not present during the reading of the verdicts because another judge was substituting for him, and therefore he did not talk to the jurors personally. Therefore he had "no personal sense of what their demeanor and attitude was during the course of their deliberations." But he felt there was a full inquiry as to the allegations of misconduct. He noted that he had received a letter from one of the jurors who thanked him for encouraging him to stay on the jury and that there was only positive contact from the jurors. He indicated he would review the transcript of the misconduct hearing. The matter was continued until June 28, 2011.

At the continued hearing, appellant's counsel mentioned that he had found numerous articles about the trial and found an article which referred to a seven-year sentence, and which also referred to information not before the jury, that appellant had withdrawn a large amount of money out of his credit union in an attempt to leave the county. Counsel requested to question the jury about what other articles they read about the case, whether they knew the source of the misinformation on the sentence repeated by Juror No. 2 and whether anyone heard a comment about the proposed sentence to be served and what amount of time remained in his sentence after considering the time already served.

The judge replied that it had conducted an adequate inquiry of the jurors during the deliberations process while it was fresh on their minds, but agreed there was some

outside source of information which gave Juror No. 2 the idea that appellant was only going to be sentenced to seven years. He said it would write to each of the jurors to ask them to tell him if there was any inappropriate injection of information during the deliberations. He would ask for a response under penalty of perjury within 10 days. He invited defense counsel to submit proposed questions.

On August 30, 2011, appellant's counsel indicated he had reviewed the jurors' responses to the court's letter and said he did not think the court's letter had addressed all his concerns and he had prepared a motion for a new trial.

At the hearing for appellant's motion for a new trial, the court reported it had received responses from each of the 12 jurors who indicated that they had received no other extraneous information other than what they had discussed during the deliberation hearing.[10] The motion for new trial was denied.

Appellant contends the court should have allowed him access to the juror contact information because the questioning of the jurors was not sufficiently detailed. He argues that because of the extensive newspaper coverage and the discovery of the mention of the incorrect sentence mentioned in one of the articles that it was clear one or more of the jurors had read the article. He argues specifically that the court should have sent a letter to the two discharged jurors. He also objects to the court's letter because it did not ask the jurors if they would be willing to speak to defense counsel.

Trial courts have broad discretion to allow access to jurors' contact information. They must balance the rights of the jurors to keep their individual thought processes and contact information confidential. Attorneys may need the contact information to learn of juror misconduct or other information that might form the basis of a new trial motion. (*People v. Tuggles* (2009) 179 Cal.App.4th 339, 380.)

Code of Civil Procedure section 206 provides that jurors have the right to refuse to discuss their verdict with anyone. If counsel wish to speak to the jurors after they have left the courthouse, they can request personal identifying information from the court

---

[10] One juror returned the form referring to the discussions about appellant's sentence but identified Juror No. 6, not Juror No. 2 as the source of the information.

pursuant to Code of Civil Procedure section 237. Code of Civil Procedure section 237 provides that: "(a)(2) Upon record of a jury's verdict in a criminal jury proceeding, the court's record of personal juror identifying information of trial jurors . . . shall be sealed until further order of the court. . . . [¶] (b) Any person may petition the court for access to these records. The petition shall be supported by a declaration that includes facts sufficient to establish good cause for the release of the juror's personal identifying information. The court shall set the matter for hearing if the petition and supporting declaration establish a prima face showing of good cause for the release of the personal juror identifying information but shall not set the matter for hearing if there is a showing on the record of facts that establish a compelling interest against disclosure. A compelling interest includes, but is not limited to, protecting jurors from threats or danger of physical harm. . . ."

Code of Civil Procedure sections 206 and 237 are designed to protect jurors from posttrial harassment by restricting the defendant from receiving personal information unless necessary. (*Townsel v. Superior Court* (1999) 20 Cal.4th 1084, 1087, *People v. Granish* (1996) 41 Cal.App.4th 1117, 1128-1129.) Nothing in these statutes abrogates the trial court's power to safeguard juror safety and privacy. (*Townsel v. Superior Court, supra*, 20 Cal.4th at p. 1096.)

While a defendant may request personal juror information, he has no absolute right to it. (*People v. Barton* (1995) 37 Cal.App.4th 709, 716.)

In order to show good cause under Code of Civil Procedure section 237, there must be "strong" indicia of juror misconduct (*People v. Tuggles, supra*, 179 Cal.App.4th at p. 385), not just speculative, vague or conclusory allegations. Moreover there must be a showing that any misconduct influenced the verdict improperly. (*People v. Jefflo* (1998) 63 Cal.App.4th 1314, 1322.)

"[J]urors in criminal cases, in particular, have 'an absolute right' not to discuss their verdict or deliberations with anyone." (See *In re Hamilton* (1999) 20 Cal.4th 273, 303, fn. 23.) Our Supreme Court has made it clear that a criminal defendant "'has neither a guaranty of posttrial access to jurors nor a right to question them about their guilt or

penalty verdict.'" (*Townsel v. Superior Court, supra*, 20 Cal.4th at p. 1092, quoting *People v. Cox* (1991) 53 Cal.3d 618, 698-699.)

We review the trial court's decision to limit the parties' contact with jurors under the abuse of discretion standard. (*Townsel v. Superior Court, supra*, 20 Cal.4th at p. 1096; *People v. Jones* (1998)17 Cal.4th 279, 317.) That is, we uphold the court's ruling unless it was arbitrary or capricious. (*People v. Santos* (2007) 147 Cal.App.4th 965, 978.)

The procedure used in this case, that is, the correspondence by the judge inviting the jurors to inform him of any misconduct during deliberations, was not authorized by statute and not one we would recommend. However, we recognize the trial court had to balance the defendant's right to an untainted verdict against the strong public policy providing for juror safety and privacy. The unusual method the trial court used was employed to determine whether there was good cause to disclose the individual jurors' names and contact information.

Counsel was unable to prove prior to the verdict that any of the jurors were misled by Juror No. 2's statements or that they had any other complaints about misconduct even though he was given the opportunity. His beliefs that misconduct occurred were mere speculation and seemed to advocate a fishing expedition and he did not demonstrate good cause sufficient to disclose juror identification information. (See *People v. Hedgecock* (1990) 51 Cal.3d 395, 419; *People v. Rhodes* (1989) 212 Cal.App.3d 541, 552.)

Here, the court attempted to balance the need for juror privacy with the request for further information from defense counsel by sending out its own letters to the jurors. Since the court did not hear anything from any of the jurors, it is not unreasonable to assume none of them would have had anything to say to any of the attorneys. No further inquiry was warranted by the court or by counsel. While we do not endorse the specific method employed, we find no violation of appellant's constitutional rights by the court's refusal to provide the contact information. (*People v. Tuggles*, *supra*, 179 Cal.App.4th at pp. 383-385.)

41

*DISPOSITION*

The judgment is affirmed.

**WOODS, J.**

PERLUSS, P. J., Concurring in the judgment.

Because the erroneous admission of Monica Gibo's testimony describing several incidents of domestic violence by David Del Toro and the related CALJIC No. 2.50.02 instruction permitting the jury to infer Del Toro had the propensity to commit acts of domestic violence were harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 17 L.Ed.2d 705] and *People v. Gonzalez* (2012) 54 Cal.4th 643, 663, I concur in the judgment. However, I write separately to explain, in brief, my fundamental differences with the lead opinion's analysis of these issues.[1]

At the outset, I fully agree the trial court erred in admitting Gibo's testimony under Evidence Code section 1109[2] because the evidence was insufficient to establish a dating relationship existed between Del Toro and the victim, Jennifer Flores, and, therefore, there was no basis to conclude the murder was an offense involving domestic violence, as required by that section. (See § 1109, subd. (d)(3) ["domestic violence" has the meaning set forth in Penal Code section 13700 and Family Code section 6211, both of which define the term as abuse committed against a spouse or former spouse, cohabitant or former cohabitant, or a person with whom the perpetrator is having or has had a dating relationship].)[3] However, for several reasons I disagree it is proper to conclude on appeal the Gibo testimony could have been admitted pursuant to section 1101, subdivision (b).

---

[1] I am more troubled by the trial court's direct correspondence with the jurors regarding possible misconduct than Justice Woods appears to be. I believe it was not only unauthorized but also improper. However, the record indicates, before sending the letter, the court advised counsel what it intended to do and invited them to submit possible questions to be included. No one objected to this unorthodox procedure before the letter was sent. Accordingly, I believe any claim of error regarding the court's actions has been forfeited.

[2] Statutory references are to the Evidence Code unless otherwise indicated.

[3] Although I agree with its conclusion on this point, I am mystified by the lead opinion's statement "the question of whether appellant was 'accused of an offense involving domestic violence' is not dispositive." That is precisely the dispositive

First, although a judgment will not generally be reversed because admissible evidence was admitted at trial on an erroneous theory, as the lead opinion observes (see *People v. Brown* (2004) 33 Cal.4th 892, 901), that principle does not apply if the underlying basis for admissibility is not fully set forth in the record. (See *People v. Robles* (2000) 23 Cal.4th 789, 801, fn. 7; *Brown*, at p. 901.) Here, even though defense counsel argued the admissibility question should be evaluated under section 1101, rather than section 1109, the trial court expressly rejected that contention, stating it was "analyzing this issue under both 1109 analysis and 352." The trial court did not engage in any of the analysis required by *People v. Ewoldt* (1994) 7 Cal.4th 380 and cases that follow it to determine whether the domestic violence incidents involving Gibo and Flores's murder were "sufficiently similar to support a rational inference of identity, common design or plan, or intent." (*People v. Carter* (2005) 36 Cal.4th 1114, 1147.) Nor was any argument on that point presented at the section 402 hearing immediately prior to Gibo's testimony. I believe it is improper for us to conduct a de novo assessment of the admissibility of evidence of uncharged offenses under section 1101, subdivision (b), on the limited record presented here. (See generally *People v. Kipp* (1998) 18 Cal.4th 349, 369 [admissibility of evidence of charged offenses committed to the discretion of the trial court and reviewed on appeal for abuse of that discretion]; *Carter*, at p. 1149 [same].)

Perhaps more fundamentally, to be admissible under section 1101, subdivision (b), as the lead opinion appears to recognize, the prior uncharged acts and the current charged offense need to be similar and that similarity itself must then be relevant to establish some fact other than the defendant's character or disposition. (*People v. Ewoldt, supra*, 7 Cal.4th at p. 393; see *People v. Kipp, supra*, 18 Cal.4th at p. 369.) Similarity, in turn, must be based on evidence of the common features between the uncharged and charged

question: The existence *vel non* of a dating relationship between Flores and Del Toro is relevant to the section 1109 analysis only to determine if Flores's murder can properly be considered an act of domestic violence.

2

conduct (see *Ewoldt*, at pp. 402-403; see also *People v. Walker* (2006) 139 Cal.App.4th 782, 803-804). For example, in *People v. Spector* (2011) 194 Cal.App.4th 1335, upon which the lead opinion relies, there was testimony by the defendant himself about what happened at his house the night the victim died, as well as testimony about prior incidents of violence in which he had been involved. The appellate court concluded there was sufficient similarity between the various accounts for the prior acts to be admissible on the issue of accident/suicide in the case before it. Here, in contrast, the only similarity was between what actually occurred with Gibo and the prosecutor's *theory* about what had happened to Flores. Del Toro's account of that evening (he went to sleep drunk after arguing with Flores) and the prior acts were not at all similar.

Without question, Gibo's testimony "helped to explain how Flores, a friend of appellant's, came to die such a violent death"—as the lead opinion posits. But not because the uncharged acts established identity, common design or plan, or intent. Rather, as the prosecutor understood when he proffered the evidence under section 1109, it showed Del Toro's propensity to commit violence against women when drunk. Gibo's testimony was not admissible for that purpose under either section 1109 or section 1101, subdivision (b).

Finally, even if Gibo's testimony concerning Del Toro's prior acts of domestic violence was properly before the jury pursuant to section 1101, subdivision (b), the court's error in allowing the evidence under section 1109 caused it to misinstruct the jury concerning the purpose for which that testimony could be considered. (See *People v. Garceau* (1993) 6 Cal.4th 140, 186 [trial court erred in instructing jury that evidence admitted pursuant to § 1101, subd. (b), could be considered for any purposing including defendant's character].) That is, the court erred in instructing the jury with CALJIC No. 2.50.02, allowing it to infer, first, that Del Toro "had a disposition to commit another offense involving domestic violence" and then, based on that inference, that "he was likely to commit and did commit the crime of which he is accused." Although

3

acknowledging this instructional error, the lead opinion's evaluation of its potential prejudicial impact is inadequate.

Echoing language from cases that consider alleged defects in the propensity instructions given at trials where propensity evidence was properly admitted (see, e.g., *People v. Loy* (2011) 52 Cal.4th 46, 76 [pre-1999 version of CALJIC No. 2.50.01]; *People v Pescador* (2004) 119 Cal.App.4th 252, 262 [CALJIC No. 2.50.02]), the lead opinion states the improperly given instruction did not authorize the jury to find Del Toro guilty "solely based on his propensity to commit crimes of domestic violence." Perhaps not. But if erroneously admitted propensity evidence had any significant impact on the verdict—and the CALJIC No. 2.50.02 instruction certainly allowed for that possibility— reversal would be required. (See *People v. Walker, supra*, 139 Cal.App.4th at p. 810.)

Notwithstanding my differences with the lead opinion, I concur in its ultimate conclusion because it is clear beyond a reasonable doubt a rational jury would have found the defendant guilty absent the erroneous admission of the Gibo testimony and the improper propensity instruction. (*People v. Gonzalez, supra,* 54 Cal.4th at p. 663 [*Chapman* harmless-error inquiry asks whether it is clear beyond a reasonable doubt a rational jury would have found the defendant guilty absent the error]; see *Neder v. United States* (1999) 527 U.S. 1, 15 [119 S.Ct. 1827, 144 L.Ed.2d 35] [same].)

In a recorded police interview played for the jury and his own testimony at trial, Del Toro admitted Flores came to his home to spend the night on August 15, 2006 (because she was sleeping in her car), they both drank a large quantity of tequila during the evening, and they argued. A neighbor heard a man and a woman arguing in Del Toro's home around 12:30 a.m. on August 16, 2006 and then tires screeching.

Flores died from strangulation with blunt force trauma to the head. She had suffered a broken nose and jaw and two broken ribs. Tire tracks led from Flores's body, where she had been found in the early morning of August 16, 2006, to the street immediately in front of Del Toro's home, about one mile away. Del Toro's truck was in his driveway. Flores's car was also parked in front of the house. Flores's DNA was

4

identified on a glove found inside the truck and on gloves next to Del Toro's kitchen sink.

A rope found in Del Toro's driveway matched a rope found lying next to Flores's body. Blood found in Del Toro's truck bed and wheel well, as well as on the mat inside the truck, was matched by forensic evidence to Flores's. In addition, blood-stained shoes in a plastic bag inside the truck, blood at the front of the house, blood at the carpet inside the front door of Del Toro's house and blood stains on the coffee table all were matched to Flores's. A plastic bag containing blood-stained clothing and a towel were found next to the coffee table in the house.

As the lead opinion concludes, the physical evidence linking Del Toro to Flores's death was overwhelming. The errors in admitting Gibo's testimony and instructing the jury regarding the use of propensity evidence were harmless beyond a reasonable doubt. Accordingly, I agree the judgment is properly affirmed.


PERLUSS, P. J.


5

SEGAL, J.,\* Concurring and Dissenting

I concur in the judgment in part for the reasons stated in the Presiding Justice's separate opinion, which I join with the exception of the last three sentences of footnote 1. I agree with the Presiding Justice that the trial court erred by admitting Gibo's testimony under Evidence Code section 1109 and by instructing the jury with CALJIC No. 2.50.02, that Gibo's testimony was not admissible under Evidence Code section 1101, but that these errors were harmless beyond a reasonable doubt.

I also concur in the judgment to the extent the lead opinion concludes that Del Toro is not entitled to a reversal of the judgment based on the search of his home. I do not entirely agree, however, with the lead opinion's analysis of this issue. I write separately to explain my conclusions that the trial court erroneously denied part of Del Toro's motion to suppress but that the error was harmless under *Chapman v. California* (1967) 386 U.S. 18 [87 S.Ct. 824, 17 L.Ed.2d 705].

Finally, I respectfully dissent from the portion of the lead opinion that upholds the trial court's ruling on Del Toro's motion for disclosure of juror personal identifying information. I conclude that the trial court violated Code of Civil Procedure section 237, an issue the lead opinion does not squarely address. While I agree with the Presiding Justice that the trial court's order "was not only unauthorized but also improper," (conc. opn. at p. 1, fn. 1) unlike the Presiding Justice I do not think Del Toro forfeited the error. Therefore, I would reverse the trial court's order on Del Toro's motion for juror information and remand the matter to the trial court to comply with the requirements of that statute, and give Del Toro an opportunity to file an appropriate motion for a new trial based on any juror information he may discover.

A. *The Trial Court Erred in Denying Del Toro's Motion To Suppress the Domestic Violence Records Seized From His Home, but the Error Was Harmless*

I agree with the lead opinion's conclusion that Del Toro is not entitled to a reversal of the judgment based on the conduct of the search of his home. I do not agree, however, with all of the lead opinion's analysis.

The search warrant directed the police to search for the following property: "White silk type fabric or any fabric resembling silk or nylon," "[a]ny type of rope, cord or device capable of being used as a ligature,"[1] "[e]vidence of blood or other evidence of bodily fluid," "[e]vidence of hair fiber," "[e]vidence of sand or any other aggregate material resembling sand particles," "[v]ehicle tires," and "[p]hotographs of the decedent or any other item of evidence that may identify the decedent." Among other challenges to the search, Del Toro argued in the trial court and argues on appeal that the searching officers exceeded the scope of the warrant when they "seized envelopes and papers in [Del Toro's] dresser drawers that pertained to his participation in a domestic violence program" because these "items [were] not even remotely akin to those listed in the property" described by the warrant.

Del Toro is correct about the scope of the warrant. The search warrant did not authorize the police to search for domestic violence class material or for any evidence that may have shown Del Toro had registered for or taken domestic violence classes. Nor did the warrant authorize the police to search for any evidence that tended to show that Del Toro had any connection with domestic violence, alcohol abuse, or anger management classes. (See lead opn. at p. 15.) The search warrant did not, as many warrants do, authorize the police to search for any evidence that might connect Del Toro

---

[1] "To 'ligate' is 'to bind with or as if with a ligature.' [Citation.] A 'ligature' is 'anything that serves for binding or tying up, as a band, bandage, or cord.'" (*Department of Community Health v. Anderson* (2013) 299 Mich.App. 591, 593, fn. 1 [830 N.W.2d 814]; see *State v. Wakisaka* (2003) 102 Hawaii 504, 509 [78 P.3d 317] ["a ligature is 'any kind of narrow rope or scarf or anything that's narrow that you can put around a neck'"].)

with the crime.  (See, e.g., *People v. Carrington* (2009) 47 Cal.4th 145, 160 [warrant to search for evidence connecting the defendant to the crime]; *People v. Balint* (2006) 138 Cal.App.4th 200, 206 ["the more specifically the warrant describes the items sought, the more limited the scope of the search," and "[c]onversely, the more generic the description, the greater the risk of a prohibited general search"].)

The lead opinion concludes that the seizure of documents showing Del Toro had registered for domestic violence classes was proper because "the search warrant authorized the detectives to search for 'any other item that could identify the decedent.'" (Lead opn. at p. 16.)  The documents relating to Del Toro's domestic violence classes, however, identified Del Toro, not the decedent, and therefore were not described by the warrant.  Moreover, the only cases cited by the lead opinion, *People v. Eubanks* (2011) 53 Cal.4th 110 and *People v. Nicolaus* (1991) 54 Cal.3d 551, involve a different issue.  These cases hold that a search warrant is not overly broad because it authorizes "a search for items that tended to show who had 'dominion and control'" over the premises. (*Eubanks*, *supra*, at p. 135; see *Nicolaus*, *supra,* at p. 575 ["dominion-and-control clauses in warrants have been upheld by the courts"].)  Such a dominion and control clause "is a standard feature in search warrant practice.  Houses and vehicles ordinarily contain evidence identifying those individuals occupying or controlling them.  Evidence identifying those in control of premises where stolen property is found tends to aid in conviction of the guilty party." (*People v. Balint*, *supra*, 138 Cal.App.4th at p. 206.)  The clause relied on by the lead opinion to justify the search and seizure of Del Toro's domestic violence class documents was not a "dominion and control" clause.  The police knew Del Toro lived at his residence; they did not need, and did not ask for the authority to search for, evidence that he lived there.

Nevertheless, any violation of the Fourth Amendment in the search and seizure of the domestic violence class documents from Del Toro's dresser drawer was harmless beyond a reasonable doubt under *Chapman v. California*, *supra*, 386 U.S. 18.  (See *People v. Moore* (2011) 51 Cal.4th 1104, 1128-1129 [*Chapman* harmless error analysis applies to Fourth Amendment violations].)  The People served a subpoena on First Stop,

a domestic violence batterer's program, seeking documents relating to Del Toro's attendance in the program and the course materials showing what he would have (and should have) learned. Counsel for Del Toro filed a motion to quash the subpoena, which the trial court denied because Del Toro had consented to disclosure of the documents. The court ruled "that the waiver that was signed in this matter by Mr. Del Toro does cover this matter. Further, I will maintain the ruling that the defendant's attendance at the program and the program curriculum are still relevant. So I'm going to overrule the objection." Del Toro has not challenged this ruling. Therefore, because the People properly obtained the domestic violence documents from the program, any violation of the Fourth Amendment in connection with seizing the documents from Del Toro's residence was harmless beyond a reasonable doubt.

B.      *The Trial Court Erred After Ruling on Del Toro's Motion Pursuant to Code of Civil Procedure Section 237 by Conducting Its Own Investigation*

"Criminal defendants have a right to trial by an impartial jury. [Citation.] '[T]here exists a "strong public interest in the ascertainment of the truth in judicial proceedings, including jury deliberations." [Citation.] . . . Lifting the veil of postverdict secrecy to expose juror misconduct serves an important public purpose. "'[T]o hear such proof would have a tendency to diminish such practices and to purify the jury room, by rendering such improprieties capable and probable of exposure, and consequently deterring jurors from resorting to them.'" [Citations.]' [Citation.]" (*People v. Tuggles* (2009) 179 Cal.App.4th 339, 379-380; accord, *Juror Number One v. Superior Court* (2012) 206 Cal.App.4th 854, 866; see *People v. Granish* (1996) 41 Cal.App.4th 1117, 1126 ["there is . . . a strong public interest in the ascertainment of the truth in judicial proceedings, and a verdict reached by prejudicial juror misconduct should not be permitted to stand"].) Nevertheless, "strong public policies protect discharged jurors from improperly intrusive conduct . . . ." (*In re Hamilton* (1999) 20 Cal.4th 273, 303,

4

fn. 23; see *People v. Wilson* (1996) 43 Cal.App.4th 839, 852 [court must consider "protecting the lives and safety of jurors who serve in criminal cases"].)

The Legislature has enacted statutes "to manage these competing interests" and to establish procedures for obtaining juror personal identifying information. (*People v. Tuggles*, *supra*, 179 Cal.App.4th at p. 380.) The statutory scheme governing the release of this information includes Code of Civil Procedure sections 206 and 237. (See *Townsel v. Superior Court* (1999) 20 Cal.4th 1084, 1096 [Legislature's intent in enacting these statutes was to "balance the interests of providing access to records of juror identifying information for a particular, identifiable purpose against the interests in protecting the jurors' privacy, safety, and well-being, as well as the interest in maintaining public confidence and willingness to participate in the jury system"]; *People v. Santos* (2007) 147 Cal.App.4th 965, 980 ["balance is properly struck under the procedures set forth in [Code of Civil Procedure] sections 206 and 237"].)

Code of Civil Procedure section 237 establishes a three-step procedure for petitioning the court for access to the sealed records of personal juror identifying information. First, the petitioning party files a petition that must be "supported by a declaration that includes facts sufficient to establish good cause for the release of the juror's personal identifying information. The court shall set the matter for hearing if the petition and supporting declaration establish a prima facie showing of good cause for the release of the personal juror identifying information, but shall not set the matter for hearing if there is a showing on the record of facts that establish a compelling interest against disclosure. A compelling interest includes, but is not limited to, protecting jurors from threats or danger of physical harm. If the court does not set the matter for hearing, the court shall by minute order set forth the reasons and make express findings either of a lack of a prima facie showing of good cause or the presence of a compelling interest against disclosure." (Code Civil Proc., § 237, subd. (b).) In this case, counsel for Del Toro filed such a petition. The court set the matter for a hearing (there were eventually three hearings). Thus, the court found, at least impliedly, that Del Toro had made a prima facie showing of good cause for the release of the information and that there was no

5

compelling interest against disclosure.  (See *People v. Tuggles*, *supra*, 179 Cal.App.4th at p. 380 ["[w]hen a defendant makes a prima facie showing of juror misconduct, the trial court must conduct a hearing"].)  The court made no factual findings of a lack of good cause or of a compelling interest against disclosure.

The statute then prescribes what occurs in the second step:  "If a hearing is set pursuant to subdivision (b), the petitioner shall provide notice of the petition and the time and place of the hearing at least 20 days prior to the date of the hearing to the parties in the criminal action.  The court shall provide notice to each affected former juror by personal service or by first-class mail, addressed to the last known address of the former juror as shown in the records of the court. . . .  Any affected former juror may appear in person, in writing, by telephone, or by counsel to protest the granting of the petition.  A former juror who wishes to appear at the hearing to oppose the unsealing of the personal juror identifying information may request the court to close the hearing in order to protect the former juror's anonymity."  (Code Civ. Proc., § 237, subd. (c).)  Here, the trial court did not comply with this requirement because it did not give notice to the jurors of the hearing so that they could protest granting of the petition, either in person, in writing, by telephone, or through counsel.

The third step governs the hearing.  Code of Civil Procedure section 237, subdivision (d), which the lead opinion does not mention, states in relevant part:  "After the hearing, the records shall be made available as requested in the petition, unless a former juror's protest to the granting of the petition is sustained.  The court shall sustain the protest of the former juror if, in the discretion of the court, the petitioner fails to show good cause, the record establishes the presence of a compelling interest against disclosure as defined in subdivision (b), or the juror is unwilling to be contacted by the petitioner. The court shall set forth reasons and make express findings to support the granting or denying of the petition to disclose."  Thus, the statute mandates disclosure of the juror information to the petitioner at the hearing unless the court sustains a former juror's protest.  Here, no former juror protested (or even could have protested because the trial court erred by not complying with the statute and giving the former jurors notice).

6

Indeed, according to the lead opinion, "there was only positive contact from the jurors." (Lead opn. at p. 38.) Therefore, the trial court should have granted the petition.

At the second hearing, the trial court, referring to the statement by Juror No. 2 during deliberations that Del Toro would only serve seven years for manslaughter, stated, "I believe that we conducted an adequate inquiry of the jurors while it was fresh in their minds and while it was still something the court [could] do about it. So as to that issue, I'm going to deny the request for access to the jurors. However, I agree with you, Mr. Gutierrez [counsel for Del Toro], that it's more than coincidence they're talking seven years. So I'm concerned that there was some source of information outside of the courtroom process that brought them to that figure." It is unclear what the trial court's ultimate ruling was, although it appears that the court may have granted the motion in part. To the extent the court was denying the motion, the court erred because there was no juror protest and Code of Civil Procedure section 237 required the court to grant the motion. To the extent the court was agreeing with counsel for Del Toro and granting the motion, the court erred because it should have ordered disclosure of the juror information "as requested in the petition." (*Id.*, subd. (d).) Either way, the court erred by failing to "set forth reasons and make express findings to support the granting or denying of the petition." (*Ibid*.)

The trial court then stated, "I'm going to do the following, which is a compromising position. . . . My intention is to write to the jurors, each one of them, to tell them that an issue has come up as to whether there was any inappropriate injection of information about the case outside the trial record and whether or not that came up during any course of jury deliberations, and I'm going to ask them to respond to me in writing under penalty of perjury, give me a short declaration of whether or not something like that occurred. And if so, if they can describe it as best they can, they should not feel restricted to the space I am going to give them, which is going to be one sheet. And I will mail this to them, and I will require them to respond to the court within 10 days of their receipt of it. Then if there's anything we need to follow up, then we will take it from there."

Code of Civil Procedure section 237 does not provide for any such "compromising position" or procedure. The Legislature provided for the exact procedure the court should follow, and the trial court did not follow it. More important, by precluding the attorneys from questioning the jurors, the trial court usurped the role of counsel and created a procedure inconsistent with our adversarial system of justice, particularly when it asked the jurors to respond under oath, a process that usually involves and is performed by counsel. In my view, once the court has made the required findings and, as here, has granted a petition (at least in part) pursuant to Code of Civil Procedure section 237, the lawyers should have an opportunity to investigate and conduct an inquiry necessary to determine whether there are grounds for a motion for new trial based on juror misconduct. In our system of criminal justice, the lawyers investigate, interrogate, and initiate the inquiry into potential factual bases for motions. (See *In re Thomas* (2006) 37 Cal.4th 1249, 1262 ["'[i]t is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore *all avenues* leading to facts relevant to the merits of the case and the penalty in the event of conviction'"]; *In re Brown* (2013) 218 Cal.App.4th 1216, 1223 ["'[c]riminal defense counsel has the duty to investigate carefully all defenses of fact and of law that may be available to the defendant'"].) Courts hear and decide those motions. The trial court's decision in this case effectively deprived counsel for Del Toro of the opportunity to do what lawyers are trained to do and interfered with counsel's ability to investigate all possible bases for the motion for new trial.[2]

---

[2] The lead opinion states that "[s]ince the court did not hear anything from any of the jurors, it is not unreasonable to assume none of them would have had anything to say to any of the attorneys." (Lead opn. at p. 41.) In my view, this statement betrays a fundamental misunderstanding of jurors, lawyers, and the jury system. Most jurors have an initial reluctance to speak to lawyers. It is the lawyers' job to overcome that resistance and, using the art and skill of their questioning, seek to obtain information and, ultimately, to discover the truth. Our system of justice depends on lawyers having the opportunity to perform this function.

The Presiding Justice acknowledges that "the trial court's direct correspondence with the jurors regarding possible misconduct" "was not only unauthorized but also improper." (Conc. opn. at p. 1, fn. 1.) He concludes, however, that Del Toro forfeited "any claim of error regarding the court's actions" because "[n]o one objected to this unorthodox procedure." (*Ibid*.)

I read the record differently. Counsel for Del Toro asked the court for "an order directing the county clerk (or jury commissioner) to disclose to defendant's counsel . . . the addresses and telephone numbers of the jurors who rendered a verdict in this action," not for an investigation by the court in lieu of an investigation by counsel. The motion filed by counsel for Del Toro sought to establish good cause under Code of Civil Procedure section 237, subdivision (b), which authorizes the release of juror information, not court investigations of jurors.

Counsel for Del Toro made it clear at the hearing that he wanted to contact (or have his investigator contact) the jurors, and that he wanted counsel (not the court) to question the jurors, either outside or inside the court. Counsel stated, "I don't ask this lightly . . . . I've been doing this [for] 31 years. I have probably tried over 80 homicide cases in my career and many other type[s] of serious cases. Only a handful of cases that I've ever asked for information from the jurors, and this is one of those cases." Counsel further stated, "I think we made a sufficient showing to have access to that information," or, in the alternative, pursuant to federal authority, "hav[e] a hearing in court" so that "the lawyers could ask questions of the jurors, something that we didn't have in this particular case." Counsel argued, "I think we have reached [the] hurdle . . . to allow us under the Civil Code of Procedure [sections] 206 and 237 to either have the court provide us with information to make contact with the jury at a reasonable time, reasonable fashion, at a reasonable place, or have them come into the court here where we could interview them."

Moreover, counsel for Del Toro objected to the letters the court sent to the jurors (albeit after the court had already sent out the letters). As the lead opinion recognizes, counsel for Del Toro "indicated he had reviewed the jurors' responses to the court's letter and said he did not think the court's letter had addressed all his concerns . . . ." (Lead

9

opn. at p. 39.) Counsel for Del Toro stated at the hearing, "My only concern or actually objection to the questions submitted to the jury, I think my focus was whether they were aware of any outside information either directly from the media or indirectly through a family member, and I don't think that issue was sufficiently addressed in the questionnaire." In my view, counsel made it sufficiently clear that he wanted to question the jurors directly, either at a reasonable time and place using the juror information or in court, and that he preserved the issue for appeal.

Therefore, I would reverse the trial court's order on Del Toro's motion for juror identifying information and direct the trial court to release the personal juror information to counsel for Del Toro. I would then allow counsel for Del Toro to file another motion for a new trial if counsel uncovers evidence justifying such a renewed motion.

SEGAL, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

10